IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 27, 2018 Session

## STATE OF TENNESSEE v. JAMES DOUGLAS HAMM, JR.

**Appeal from the Criminal Court for Sullivan County**
**No. S63930    Lisa D. Rice, Judge**

---

### No. E2016-02265-CCA-R3-CD

---

The defendant, James Douglas Hamm, Jr., appeals his Sullivan County Criminal Court jury convictions of vehicular homicide by intoxication, leaving the scene of an accident involving a death, reckless endangerment, driving under the influence, failure to exercise due care, and running a red light, challenging the trial court's denial of both his motion to dismiss based upon the failure to preserve certain evidence and his motion for a mistrial premised on juror bias. In addition, the defendant claims that the prosecutor's closing argument was improper and that the evidence was insufficient to support his convictions of vehicular homicide and reckless endangerment. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Troy L. Bowlin, II, Morristown, Tennessee (on appeal and at trial); and Randall Reagan, Morristown, Tennessee (at trial), for the appellant, James Douglas Hamm, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Lesley Tiller and Kent Chitwood, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

In November 2014, the Sullivan County Grand Jury charged the defendant with vehicular homicide by intoxication, leaving the scene of an accident involving death, two counts of reckless endangerment, failure to exercise due care, and running a red light; the defendant was also charged with alternative counts of driving under the influence: driving under the influence of an intoxicant, driving with a blood alcohol concentration of

.08 percent or more, and driving with a blood alcohol concentration of .20 percent or more. The trial court conducted a jury trial in February 2016.

The State's proof at trial showed that on the evening of June 23, 2014, Glenn and Kathy McClure were seated at a table by the front window of Raphael's Restaurant in Kingsport when they noticed a white GMC Yukon park directly in front of the restaurant. The McClures noticed that the driver of the vehicle, later identified as the defendant, was having difficulty walking and was "hanging on to the car" as he made his way toward the Colonial Heights Package Store, which was located next door to the restaurant. The McClures also observed the defendant's tripping over the curb before entering the store.

The defendant purchased a bottle of vodka at 7:50 p.m. The McClures again observed the defendant unsteadily return to his vehicle, bumping into the vehicle and struggling to open the driver's side door. After staring blankly for a short time, the defendant eventually started the vehicle after fumbling with the gearshift a few times. Mrs. McClure remarked to her husband that she "'sure hope[s] he's able to put it in reverse and not forward.'" The defendant then placed the vehicle in drive and lurched forward, jumping the curb and striking the front of the building which housed the restaurant. The defendant, who was separated from the McClures' table by only the length of his vehicle's hood and the restaurant's front pane of glass, briefly made eye contact with Mr. McClure before reversing the vehicle several feet, fumbling with the gearshift, and again driving forward. On this second occasion, the vehicle jumped the curb and struck an elevated exterior ashtray before hitting the restaurant more forcefully and causing the glass windows to rattle. Restaurant patrons began screaming, and Mrs. McClure called 9-1-1 as Mr. McClure made his way to the parking lot to confront the defendant. Tonya Drecol, who had just finished dining at Raphael's with her family and who was seated in her vehicle in front of the restaurant, also observed the defendant strike the building with his vehicle. Ms. Drecol got out of her vehicle and, using her cellular telephone, photographed the defendant's license plate.

Mr. McClure approached the driver's side of the vehicle and spoke to the defendant through the open window, informing the defendant that he was "'in no shape to drive'" and asking the defendant to give him his keys and park the vehicle. After mumbling something to Mr. McClure, the defendant "took off." Mr. McClure yelled at Ms. Drecol to "'[g]et out of the way, here he comes,'" as the defendant "swooped to the back." Ms. Drecol moved out of the way just before the defendant drove through the spot where she had been standing. The defendant jumped another curb before running a red light as he made a right turn on Fort Henry Drive. Mr. McClure observed the defendant's vehicle fishtail as he pulled out in front of another vehicle. Mr. McClure also noticed the defendant's driver's side rearview mirror, which had been broken and was being held

together by two large rubber bands. Joseph Way, the Package Store clerk who sold the defendant the bottle of vodka, ran outside after hearing the defendant's vehicle hit the building, and Mr. Way witnessed the defendant "recklessly . . . fleeing out of . . . [the] parking lot" and "saw him kind of pull out in front of somebody that was oncoming traffic" without yielding to the traffic light.

Through the testimony of Brian West, a records custodian with Redflex Traffic Systems, the State introduced into evidence photographs of the defendant's vehicle entering the intersection of Fort Henry Drive and Lebanon Road on a red light with the passenger side tires over the right fog line. The State also introduced into evidence a Redflex photograph taken minutes later showing the defendant's vehicle crossing through the intersection of Fort Henry Drive and Moreland Drive at 7:55:49 p.m.

Between 7:50 and 8:00 p.m. on June 23, Hoyt Denton parked his truck just north of Moreland Drive near a bridge on Fort Henry Drive that spanned railroad tracks. Mr. Denton and his passenger, the victim Michael Locke, were placing political campaign signs in the area. While Mr. Denton walked to an adjacent hillside to place signs on a metal fence post, the victim got out of the vehicle and was standing on the pedestrian area of the bridge while talking on his cellular telephone to Mark Vance about the placement of the signs. Phyllis Cooper, who was approaching the bridge, noticed a man standing on the bridge "very close to the guardrail" and looking over the side of the bridge. Mrs. Cooper suddenly saw "a flash of white" as a vehicle "drifted over the line" and the man's body was "propelled over the rail like a swan dive."

At the same time, Mr. Denton heard a loud noise and turned to see the victim in midair in a "jackknife position" going over the bridge while a "white blur" traveled across the bridge. The victim fell 20 feet onto the rocks below. Mr. Denton immediately called 9-1-1, and, in the meantime, Mrs. Cooper turned her vehicle around at the nearby Sonic Restaurant and returned to the scene while her husband also called 9-1-1. Mr. Vance, who had been speaking with the victim on the telephone, suddenly heard only traffic noise. He repeated "Mike" several times, but when he did not receive a response after 15 to 30 seconds, Mr. Vance ended the call, assuming that the victim had walked away from the telephone to assist Mr. Denton. When Mrs. Cooper arrived at the scene, she attempted to descend the hill to aid the victim but was unable to navigate the steep hill. From her observation point, Mrs. Cooper ascertained that the victim was not breathing.

Kingsport Police Department ("KPD") Officer Billy Boyd was dispatched to the scene of "a wreck with injuries" on the evening of June 23. Upon his arrival at the bridge, Officer Boyd observed a shoe on the side of the road and a blue cellular telephone

near the guardrail. KPD Officer Aaron Grimes photographed the victim's body, which was located partially under the bridge and was missing one shoe.

Doctor Karen Cline-Parhamovich, who performed the victim's autopsy, testified as an expert in the field of forensic pathology. She opined that the victim died from blunt force trauma to the head and neck. The victim sustained a "gaping laceration" to the top of his head which exposed his skull in addition to numerous abrasions to his forehead. The victim's neck was broken, and he suffered a "cluster" of contusions on the upper left side of his chest. The victim also had an abrasion on his left shoulder and a patterned contusion on his buttocks. The victim's lower left leg was fractured 15 inches above his heel, and the bone lacerated the victim's skin. The victim had several contusions on his left foot and ankle and numerous internal injuries, including bruised lungs and lacerations to his lungs and spleen. Doctor Cline-Parhamovich opined that the injury to the victim's left leg was consistent with his having been in a standing position at the time he was struck by the vehicle. The autopsy revealed no evidence of drugs or alcohol in the victim's blood or urine.

After the defendant had crossed the bridge, he continued driving north on Fort Henry Drive. At the same time, Jonathan Womack was driving north on Fort Henry Drive, and as he was preparing to turn right onto John B. Dennis Highway, he encountered the defendant's vehicle making the same turn. Mr. Womack contacted 9-1-1 and made the following report:

> A Yukon, a GMC Tahoe or Blazer or something – he's in between Memorial Boulevard and Stone Drive on John B. Dennis. He's going 30 miles an hour, he's all over the road, he's going very, very slow, he looks highly intoxicated. I've watched him in my rearview mirror almost cause three wrecks. . . . He's about to – oh, God, he's going to get hurt. . . . [The car] is white. One of the mirrors looks like it's almost knocked off. He's driving off the road again. This is the fifth time he's drove off the road.

Orynthia Rashad Wolfe was also driving on John B. Dennis Highway at approximately 8:00 p.m. on June 23 and encountered the defendant's vehicle straddling the two lanes of the highway. Mr. Wolfe saw three vehicles swerve to avoid colliding with the defendant's vehicle. As Mr. Wolfe passed the defendant's vehicle, he noticed that the defendant's head was bobbing up and down toward the steering wheel, causing Mr. Wolfe to speculate that the driver was experiencing a medical emergency. Mr. Wolfe then took the Memorial Boulevard exit, and the defendant followed him off the exit. Mr. Womack, who was still talking to the 9-1-1 dispatcher, observed the

defendant's vehicle exiting the highway at Memorial Boulevard and relayed this information to the dispatcher.

Mr. Wolfe, who had been watching the defendant's vehicle in his rearview mirror, saw the defendant stop the car at an angle on the exit ramp. Mr. Wolfe immediately stopped his own vehicle and called 9-1-1. Mr. Wolfe approached the passenger side of the defendant's vehicle and noticed that the sideview mirror "had been pushed in" and that the mirror "had a crack on it." Mr. Wolfe discovered that the defendant, who was seated in the driver's seat of the vehicle, was unconsious.

Brent Arnold, who had just taken the Memorial Boulevard exit and passed the defendant's vehicle on the ramp, noticed that the defendant was "slumped over in his seat" and appeared to be having "a medical condition or [was] passed out." Mr. Arnold stopped his vehicle and walked to the driver's side of the defendant's vehicle; Mr. Wolfe was already standing on the passenger side and attempting to rouse the defendant. Mr. Wolfe yelled, "'Excuse me, sir,'" and knocked on the passenger-side of the vehicle for several minutes, and Mr. Arnold tapped the defendant on the side to wake him. When the defendant came to, he "started using a lot of profanity" and indicated that he required no medical attention. The defendant asked Mr. Wolfe where he was, and Mr. Wolfe responded that he was on the Memorial Boulevard exit ramp. The defendant "passed out again," and Mr. Arnold again roused him by tapping him. The men removed the keys from the vehicle's ignition; Mr. Arnold "could smell that he had been drinking." The defendant told Mr. Wolfe that he "didn't want to go to jail," and Mr. Wolfe assured him that he wanted "to help him" and "try to save his life."

KPD Officer Ray McQueen was dispatched to the Memorial Boulevard exit ramp and discovered the defendant's parked vehicle with Mr. Arnold and Mr. Wolfe standing on either side of the vehicle. When Officer McQueen approached, the men standing beside the vehicle handed the defendant's car keys to the officer, and Officer McQueen noticed that the defendant "[a]ppeared to be a little sluggish." Before Officer McQueen could ask the defendant for his driver's license, KPD Officer William Clare arrived at approximately 8:09 p.m.

The defendant fumbled with his wallet while trying to retrieve his driver's license, handing Officer Clare three different credit cards before finally producing his license. Officer Clare noticed the smell of an alcoholic beverage emanating from the defendant and observed that the defendant was lethargic and slurring his speech. The officers discovered an unopened bottle of vodka inside a paper bag in the defendant's vehicle. Officer Clare then provided the defendant with his *Miranda* warnings, at which point the defendant stated three times, "'I'm guilty. I been drinking.'"

The defendant agreed to perform field sobriety tests but needed assistance in getting out of his vehicle. Once outside the vehicle, the defendant required assistance to stand and to walk. Because Officer Clare did not believe the defendant could perform the field sobriety tests without risking injury, he placed the defendant in his patrol car and transported the defendant to the hospital to obtain a blood sample.

Tennessee Bureau of Investigation ("TBI") Agent Regina Aksanov analyzed the defendant's blood sample and determined his blood alcohol content to be 0.373. Doctor Kenneth Ferslew, who testifed as an expert in the field of forensic toxicology, testified that a blood alcohol content of 0.3 or more is "potentially lethal," depending on the individual's level of alcohol tolerance. Based on the defendant's weight of 185 pounds, Doctor Ferslew opined that the defendant would have consumed between 8.65 and 8.91 ounces of pure ethanol to reach a blood alcohol content of .373.

When Officer Grimes arrived at the Memorial Boulevard exit ramp, he examined the defendant's vehicle. Officer Grimes noticed that the vehicle's passenger sideview mirror was "folded in" and that the front passenger-side tire, tire rim, and running board were "wiped clean" of dust and dirt as though those areas had "com[e] into contact with something." TBI Agent Terra Asbury analyzed swabs from these areas of the defendant's vehicle and discovered "a limited amount of human DNA" on the passenger-side running board swab, but the amount was insufficient to obtain a profile.

Dale Farmer, who testified as an expert witness in the field of accident reconstruction, performed an extensive examination of the defendant's vehicle. As part of his examination, Mr. Farmer took detailed measurements of the defendant's vehicle. He determined that the base of the passenger-side mirror was approximately 47.5 inches from the ground and that the top of the mirror was approximately 54.5 inches from the ground. In addition, he testified that the vehicle weighed 5,746 pounds "when it c[ame] off of the assembly line with no fluids or any occupants inside the vehicle." Mr. Farmer also visited the bridge on Fort Henry Drive and measured the distance between the fog line and the concrete guardrail base, which he determined to be four feet. Measuring from the road, the top of the guardrail was 21 inches in height, but the distance from the concrete curb to the top of the guardrail was approximately 18 inches. Mr. Farmer reviewed video footage from the traffic camera located at the intersection of Moreland Drive and Fort Henry Drive and determined that the defendant was traveling 39 miles per hour. At this speed, it would have taken the defendant approximately 18 seconds to drive the 740 feet from the intersection to the point of impact with the victim, and from the time the defendant left the Raphael's parking lot, it would have taken him less than two minutes to arrive at the point of impact on the bridge.

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgments of acquittal and a *Momon* colloquy, the defendant elected not to testify and chose to present no proof. Based on this evidence, the jury convicted the defendant as charged on all counts. Following a sentencing hearing, the trial court merged the alternative DUI counts and the conviction of failure to exercise due care with the defendant's conviction of vehicular homicide and sentenced the defendant as a standard offender to a term of 10 years' incarceration. In addition, the court imposed two-year sentences for each of the defendant's two convictions of reckless endangerment and his one conviction of leaving the scene of an accident involving death; the second reckless endangerment conviction was to be served concurrenly with the first, and the first reckless endangerment conviction and the conviction for leaving the scene were to be served consecutively to the defendant's 10-year conviction. Finally, the court imposed a sentence of 30 days for the defendant's conviction of running a red light, to be served concurrently with his 10-year conviction, for a total effective sentence of 14 years.

Following the denial of his motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by denying both his motion to dismiss based upon the failure to preserve certain evidence and his motion for a mistrial premised on juror bias. The defendant also claims that the prosecutor's closing argument was improper and that the evidence was insufficient to support his convictions of vehicular homicide and reckless endangerment. We will address each issue in turn.

## I. Failure to Preserve Evidence

The defendant first contends that the trial court erred by denying his motion to dismiss due to the State's failure to preserve certain evidence, thus violating his due process rights. In the alternative, the defendant argues that the trial court should have excluded all evidence and testimony which relied on the lost or destroyed evidence. Specifically, the defendant complains that the State lost a single hair that had been collected from the hood of the defendant's vehicle, and the defendant sought exclusion of testimony or evidence related to a black substance found on the victim's sock; reference to or photographs of the scuff marks on the defendant's tire, tire rim, and running board; and references to or reports of DNA samples taken from the defendant's vehicle. The State responds that the trial court acted within its discretion in denying the defendant's motion.

At the February 2016 hearing on the defendant's motion to dismiss, TBI Agent Asbury testified that she received swabs taken from the passenger side mirror, running board, front wheel rim, and front tire of the defendant's vehicle and that she performed DNA analysis on some of those swabs. None of the swabs she tested

contained any blood, but a swab from the running board contained "a limited amount of human DNA." The amount, however, was too small to obtain a DNA profile.

KPD Detective Martin Taylor testified that, on the evening of June 23, Detective John Blessing contacted him and asked him to assist with a vehicle fatality. Detective Taylor arrived at the John B. Dennis exit ramp approximately 30 minutes later and photographed the defendant's vehicle's running boards, wheel rim, and interior. Detective Taylor noticed a scuff mark on the passenger-side front tire and wheel rim, a scuff mark on the passenger-side running board, and a scuff mark just below the mirror "that was pushed in against the window on the passenger side."

With regard to the scuff marks on the tire and the wheel rim, Detective Taylor testified that the areas "stood out" because the tire was "completely covered in debris, dirt, whatever, just dirty, and then these areas are actually shiny" and "down to the original like chrome finish of the tire." Detective Taylor also noticed "an upright mark that would be consistent in [his] opinion of what a cigarette stand might be," as well as a "scuff mark . . . on the . . . passenger side right front corner" near the vehicle's fog light. Detective Taylor later examined the cigarette stand but saw no evidence of a "transfer mark" from the stand to the vehicle. He noted, however, that a collision would not always result in a transfer mark. Detective Taylor opined that "something or someone had been struck on [the passenger side] of the car," leaving behind a "material mark."

Detective Taylor also photographed an "eyelash type hair" that was located on the passenger side of the vehicle's hood. Using tweezers, Detective Martin collected the hair, placed it in a small evidence box, and sealed the box inside a bag. When the district attorney's office later contacted him and asked him to retrieve the hair to determine if it was of a sufficient length for testing, Detective Martin unsealed the bag and opened the box, but he was unable to find the hair. Detective Martin photographed the process of unsealing the bag and opening the box, and he immediately notified the district attorney's office that the hair was missing and filed a supplemental report.

Detective Taylor confirmed that a KPD officer drove the defendant's vehicle from its location on the exit ramp to the KPD Justice Center basement, where the vehicle was stored in an area only accessible by a pass key and was covered with a large tarp secured with crime scene tape and a bungee cord. On the day prior to the motion hearing, Detective Taylor again photographed the vehicle's front passenger-side wheel area and running board. Detective Taylor testified that the photograph of the running board showed an area where paint had been scraped away for testing. Aside from the paint scraping and the removal of the passenger-side mirror for evidence collection, the defendant's vehicle was in the same condition as it was when Detective Taylor photographed it on June 23, 2014. With respect to the scuff mark on the tire, Detective

Taylor testified that, due to lighting conditions, he could not see the scuff mark in the photograph he had taken the day before, but he recalled that the scuff mark was visible when he took the photograph.

TBI Agent Nelson, a forensic scientist with the Trace Evidence or Microanalysis Unit, testified that he received the victim's shorts, shirt, belt, underwear, socks, and one shoe for testing, as well as a pair of wet gloves from a witness and four paint samples collected from the defendant's vehicle. The victim's shirt and shorts yielded road debris, white and yellow road paint, and broken glass particles. Agent Nelson discovered glass particles, road debris, and "green paint type material" on the gloves. The victim's socks were "[f]ully covered in blood" but showed signs of road debris. Because Agent Nelson found no paint particles on the clothing, he did not analyze the paint samples.

Agent Nelson confirmed that he was never asked to conduct a brake dust analysis on the victim's clothing and that his unit had no specific procedure to perform such an analysis. Even if he had been able to conduct such an analysis, the victim's blood-soaked socks would have dissolved or covered any potential brake dust particles.

KPD Officer Robert Grimes responded to the scene at the Fort Henry Drive bridge and observed both a shoe and a cellular telephone on the side of the road. Officer Grimes circled the location of both items with spray paint and photographed the items as well. Officer Grimes also photographed the victim, who was lying just under the bridge clothed in a t-shirt, shorts, socks, and one shoe.

Officer Grimes then traveled to the John B. Dennis exit ramp and photographed the defendant's vehicle, observing that the passenger-side mirror was folded in and that one of the vehicle's tires had an area that was "wiped off like it was scrubbed up against something." After photographing the defendant's vehicle, Officer Grimes drove to the hospital and photographed the victim in the morgue. Because the victim was missing a shoe, Officer Grimes photographed, among other things, the victim's feet. The photograph of the victim's right foot, which was still clad in a shoe, showed a slightly grey discoloration on the victim's sock. A few days later, Mr. Farmer contacted Officer Grimes and mentioned that the discoloration on the victim's sock seemed consistent with the scuff mark on the defendant's tire. It was the understanding of Officer Grimes that the sock could not be tested for the presence of brake dust because it was saturated with blood.

Officer Grimes confirmed that KPD Officer Jessee had driven the defendant's vehicle from the exit ramp to the KPD, explaining that because the vehicle

was still operational, it did not require towing. Officer Grimes recalled that the passenger-side mirror was still in its folded position when the vehicle arrived at the KPD.

KPD Officer Chad Jessee testified that he had been instructed to drive the defendant's vehicle from the exit ramp to the KPD, which was approximately four miles away. Officer Jessee experienced no accidents or other driving incidents during the four-mile trip, and he caused no damage to the vehicle.

Cecil Nunley, Sullivan County deputy coroner, transported the victim's body from the scene to the morgue. When the medical examiner notified Mr. Nunley that he had ordered an autopsy on the victim, Mr. Nunley placed a toe tag on the victim's body. Mr. Nunley did not recall removing the victim's sock before attaching the toe tag, and he stated that he "would have had no reason to take [the sock] off because [he] could have put the toe tag on it anyway." Mr. Nunley agreed that the photograph that depicted the victim's body with a toe tag on his bare foot and a sock lying near the body would have accurately depicted the state of the victim's body when he attached the toe tag, and he insisted that he had touched "nothing but the toe."

Laura Parsons, forensic operations administrator and death investigator for the William L. Jenkins Forensic Center, received the victim's body from Mr. Nunley on June 24. When she opened the body bag, the victim's left sock was lying inside the bag "touching a pool of blood," and the victim's bare left foot had a toe tag attached.

KPD Sergeant John Blessing testified that he interviewed witnesses at the Colonial Package Store and investigated a claim "that the alleged vehicle had maybe hit the building or something there." As part of his investigation, Sergeant Blessing collected a crushed exterior ashtray. Although the ashtray's elevated arm was bent, nothing indicated that any paint had transferred between the ashtray and the vehicle. When asked what evidence he had that the defendant's vehicle had struck the ashtray, Sergeant Blessing responded that he was only aware of the "statements from witnesses."

Mr. Farmer testified that he had testified in previous trials as an expert in the field of traffic accident reconstruction and that he had received training in transfer pattern analysis. Mr. Farmer, after examining the evidence in the defendant's case, concluded that brake dust had transferred from the tire rim of the defendant's vehicle onto the victim's sock. Mr. Farmer stated that, in reaching this conclusion, he had conducted no testing on the tire but that his conclusion was based on "common sense." Mr. Farmer explained that the stain on the victim's sock was "similar to the dust that's on the wheel" and that the "pattern design on the tire in the dust area . . . was similar to the sock that [the victim] was wearing." Mr. Farmer testified that it was his understanding

- 10 -

that the blood had soaked into the sock to such a degree that the brake dust had dissipated and could not be tested.

Mr. Farmer opined that the "straight up and down black mark" beside the vehicle's fog light was caused by the defendant's collision with the black ashtray outside the package store, based on both witness reports and measurements of the ashtray. Mr. Farmer also opined that the passenger-side mirror of the defendant's vehicle struck the interior of the victim's right forearm. Mr. Farmer believed that, at the point of impact, the victim was standing at an angle with his left foot extended near the road's fog line while holding his cellular telephone in his right hand.

At the conclusion of the hearing, the trial court ruled, with respect to the hair on the vehicle's hood, that the hair was not "intentionally destroyed or altered" and that "its presence or absence would [not] tend to affect the fundamental fairness of" the defendant's trial because, even if the hair was of a sufficient length to allow testing, it would not have served to exculpate the defendant. The court ruled that the State would be held "to their representation that they're not going to present any testimony or evidence concerning the hair." With respect to the black substance on the victim's sock, the court held that Mr. Farmer's testimony regarding the brake dust was based on common sense rather than scientific testing, and that, as a result, the State was prohibited from eliciting testimony from Mr. Farmer or any other witness that the dark substance on the victim's sock or the pattern on the vehicle's wheel was caused by contact of the victim's sock with the brake dust on the vehicle. The court further stated that, had the sock been subject to testing, it would likely have implicated the defendant rather than exculpated him.

Turning to the DNA samples, the court found that the swabs were appropriately tested, that they were not destroyed or altered, and that if the DNA had yielded results of anyone other than the victim, the evidence would have done nothing to exculpate the defendant. Finally, with respect to the scuff marks on the tire, the rim, and the running board, the court found that the marks were not "in any way destroyed, altered, or changed."

> Granted it's not the typical that I've seen in a situation that a vehicle involved in a vehicular homicide is driven by an officer to ---- four miles, based on the testimony of Officer Jessee, to the police department from the scene of John B. Dennis. It's typically a ---- a flatbed or a car hauler of some type would be used to move the vehicle.

However, this vehicle was drivable. It was a short distance. And it's highly possible that hooking it to a flatbed or a car ---- car hauler of some sort could have disturbed more than simply driving it from the four mile distance between the two points of interest here.

And the vehicle has been stored. Again, it's been vividly photographed. It's been available to the defense since late May for their inspection and ---- and testing if they elected to do so. So I do not believe that either moving the vehicle the four miles, which obviously the vehicle had to be moved by some mechanism and gotten out of traffic and stored properly. So I don't believe in any way it's been altered, destroyed, or damaged in terms of the scuff marks, etcetera.

In *State v. Ferguson*, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." *Merriman*, 410 S.W.3d 779, 784 (citing *Ferguson*, 2 S.W.3d 912, 915-16). The court observed that "the due process required under the Tennessee Constitution was broader than the due process required under the United States Constitution" and rejected the "bad faith" analysis espoused by the United States Supreme Court, *Merriman*, 410 S.W.3d at 784-85 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (holding "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law")), in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial," *Merriman*, 410 S.W.3d at 785. The supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." *Id.* at 784-85 (citing *Ferguson*, 2 S.W.3d at 914, 917).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence," *Merriman*, 410 S.W.3d at 785, and observed that the State's duty to preserve was "limited to constitutionally material evidence," *id.* The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." *Merriman*, 410 S.W.3d at 785 (citing *Ferguson*,

2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure:

> "(1) [t]he degree of negligence involved;
> (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
> (3) [t]he sufficiency of the other evidence used at trial to support the conviction."

*Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." *Merriman*, 410 S.W.3d at 785-86.

We review the trial court's decision concerning the fundamental fairness of a trial conducted without the missing evidence under a de novo standard of review. *Id.* at 791 ("Because the application of *Ferguson* . . . presents a constitutional issue, we will apply a de novo standard of review to the trial court's decision concerning the fundamental fairness of the trial."). The trial court's choice of remedy, however, will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 792 ("Thus, when the chosen remedy is consistent with the findings made by the trial court utilizing the *Ferguson* considerations, we will not overrule that choice on appeal.").

In the instant case, the single hair found on the hood of the defendant's vehicle was not constitutionally material evidence because, even if a DNA analysis could have been performed on it, the results of such an analysis would never have been exculpatory. If the hair had been proven to be that of the victim's, such evidence would have only served to inculpate the defendant, and if the hair had been proven to have come from any other source, it would have proven nothing. Thus, the trial court committed no error in determining that the State had no duty to preserve the hair.

Similarly, the black substance on the victim's sock was not constitutionally material evidence because it, too, would have only served to inculpate the defendant if a brake dust analysis could have been performed on it. If such an analysis revealed the black substance to be anything other than brake dust, it again would have proven nothing.

In a related matter, the defendant argues that the trial court improperly permitted the State to address the similarity between the black smudge on the victim's

sock and the transfer pattern on the vehicle's tire, citing the State's reference to the black mark on the victim's sock during rebuttal argument. The defendant is simply incorrect. The trial court ruled that neither Mr. Farmer nor any other witness could testify about the black substance on the victim's sock and the transfer pattern on the vehicle's tire as having been caused by brake dust since no brake dust testing was available. The court did not prevent the State from mentioning the black mark on the sock or the scuff marks on the vehicle, which is precisely what the prosecutor did during rebuttal argument.

With respect to the scuff marks on the vehicle's tire, tire rim, and running board, the trial court did not err in its determination that the marks had not been destroyed, altered, or changed, thus removing it from the purview of *Ferguson*. Nothing indicated that the vehicle was in any way damaged or altered during the four-mile drive from the exit ramp to the police station, and the vehicle was extensively photographed. In any event, even if the evidence on the vehicle had been altered in some way during the four-mile drive, no lost or destroyed evidence on the vehicle would have exculpated the defendant.

Finally, the trial court committed no error in its determination that the DNA swabs had not been destroyed. The swabs were appropriately tested and simply yielded no DNA evidence. Again, if the swabs had returned a DNA profile, proof that the DNA belonged to anyone other than the victim would have been neutral at best and would have in no way exculpated the defendant.

In short, we find no abuse of discretion in the lower court's denial of the defendant's motion to dismiss.

## II. Juror Bias

The defendant next contends that the trial court erred by failing to dismiss certain jurors for cause and by failing to grant a mistrial due to juror bias. The State responds that the trial court acted within its discretion.

During voir dire, it came to light that several potential jurors had sat on a jury together the previous week, but nothing indicated that their prior association impacted their impartiality. All but one of those jurors were dismissed pursuant to peremptory challenges. Another juror, Juror Bishop, when asked if she possessed "such strong feelings about alcohol that [she] wouldn't be able to" impartially hear the case, responded that the defendant's alleged intoxication "would have bearing on how [she] feels" because "if you're drinking and you get in a car then you're automatically, like premeditated, you're getting ready to kill someone." Juror Bishop explained that her belief was based on "family members that have drank before." Juror Bishop later added

that her husband's aunt and uncle had been killed in a car accident caused by an intoxicated driver and that her brother had injured his wife in a drunk-driving accident. The defendant asked that Juror Bishop be excused for cause, and the trial court agreed to do so.

The defendant then moved for a mistrial, or in the alternative, to strike all members of the panel who had been present during the questioning of Juror Bishop based on her remarks having "prejudiced the entire jury panel." The trial court denied the motion, concluding that Juror Bishop's statements about the loss of and injuries to family members as a result of drunk drivers were insufficient "to contaiminate or poison the remaining jury panel." The court also noted that it had excused Juror Bishop for cause.

"A court may discharge from service a grand or petit juror . . . for any other reasonable or proper cause, to be judged by the court. That a state of mind exists on the juror's part that will prevent the juror from acting impartially shall constitute such cause." T.C.A. § 22-1-105. Accordingly, the trial court retains "wide discretion in ruling on the qualifications of a juror," *State v. Howell*, 868 S.W.2d 238, 248 (Tenn. 1993) (citing *State v. Kilburn*, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989)), and the trial court's ruling in this regard will not be overturned absent a showing of an abuse of that discretion, *Burns v. State*, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979). "[I]rrespective of whether the trial judge should have excluded the . . . challenged jurors for cause, any error in this regard is harmless unless the jury who heard the case was not fair and impartial." *Howell*, 868 S.W.2d at 248 (citing *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989)). When the defendant preserves the issue by exercising all of his peremptory challenges, "the failure to correctly exclude a juror for cause is grounds for reversal only if . . . an incompetent juror is forced upon him." *Howell*, 868 S.W.2d at 248 (citing *Ross v. Oklahoma*, 487 U.S. 81, 98 (1988); *State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990)).

With respect to the defendant's claim that the trial court should have excused for cause the group of jurors who had previously sat together on an earlier jury, the record reflects that the defendant failed to challenge those jurors for cause, and all of the jurors at issue with the exception of Juror Croomes were dismissed pursuant to peremptory challenges; the defendant never challenged Mr. Croomes. Thus, the issue has been waived. *See State v. Jones*, 789 S.W.2d 545, 549 (Tenn. 1990) (defendant cannot prevail on a claim that an incompetent juror was forced upon him unless he challenges said juror for cause and exercises a peremptory challenge against that juror). Furthermore, nothing indicates that Juror Croomes's service on a prior, unrelated criminal trial jury impacted his impartiality in the present case.

Turning to the trial court's denial of the defendant's motion for mistrial or to excuse all jurors tainted by the statements of excused Juror Bishop, we find no abuse of discretion in the trial court's decision to deny the motion for mistrial. "Normally, a mistrial should be declared only if there is a manifest necessity for such action." *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003) (citing *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" *Saylor*, 117 S.W.3d at 250 (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). Here, nothing indicated a manifest necessity for the declaration of a mistrial, and the trial court's decision to deny the motion did not result in a miscarriage of justice. *See Saylor*, 117 S.W.3d at 250. Moreover, no abuse of discretion occasions the trial court's refusal to excuse all jurors who overheard Juror Bishop's statements. The defendant has failed to demonstrate that those jurors were in any way biased by Juror Bishop's statements. This issue avails the defendant no relief.

### III. Prosecutorial Misconduct

Next, the defendant asserts that the trial court erred by denying his motion for new trial on the basis of the prosecutor's impermissibly commenting, during closing argument, on the defendant's failure to testify.

At the outset of his closing argument, the prosecutor made the following statements:

> Again, I'm going to try to make this as brief as possible. We talked about it in opening argument. You've heard all the proof. Okay, this is not proof. This is just what I'm going to attempt to do is to summarize the proof you've heard. Does everyone understand that? What you're about to hear from me or the defense attorney is not going to be additional proof.
>
> All right, now anything I might say, if I happen to say, "I believe something," or whatever, I attempt not to say something. My opinion doesn't matter. You understand only the proof matters. Nothing I say should be construed to comment on the defendant's failure to testify; not what I'm attempting to do, trying to do. I just want to make sure that's clear as well if I make a mistake somehow. I just want to go back to [one] more thing from opening and then we'll go right into the summary. As we talked about ---

At that point, defense counsel asked to approach the bench and objected to the prosecutor's commenting on the defendant's failure to testify. The trial court noted the objection and addressed the jury thusly:

> Ladies and gentlemen, I want to remind you as I did just momentarily ago. I want to tell you that the defense, as I told you, is never required to put on proof or prove they're innocent. [The defendant] is shrouded as I told you at the beginning of this process with the presumption of innocence and that includes up until you go back and you begin your deliberations and you reach a verdict. Do all of you understand that? And any comment that is made about the defense putting on proof or [the defendant] testifying or not testifying is not proper. The defense is never required to put on any proof and the defendant is never required to testify. It's an absolute right to invoke his Fifth Amendment privilege and that is sacred in our Constitution and it is applicable in all criminal cases to all defendants, both at the state and federal level. Does everyone understand that? And the defendant's failure to testify or election not to testify is not to be considered any inference of guilt or you are to draw no conclusions from that. As I said, he has an absolute right under the Constitution of this State and the United States to not testify should he elect not to do so and that is all of our rights under the Constitution. Everyone understand that? All right.

Pursuant to the Fifth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution, a criminal defendant has a fundamental right not to testify. *See State v. Jackson*, 444 S.W.3d 554, 586 (Tenn. 2014). It is well-settled that this right prohibits a prosecutor from commenting on a defendant's decision not to testify at trial. *See Griffin v. California*, 380 U.S. 609, 614-15 (1965) ("For comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice,' . . . which the Fifth Amendment outlaws."); *State v. Hale*, 672 S.W.2d 201, 203 (Tenn. 1984) (cautioning that the "subject of a defendant's right not to testify should be considered 'off-limits' to any conscientious prosecutor").

We review the defendant's claim of prosecutorial misconduct due to impermissible commentary under a de novo standard of review. *State v. Jackson*, 444 S.W.3d at 588. We also apply a two-part test to determine "(1) whether the prosecutor's

manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's decision not to testify." *Id.*

Here, the prosecutor's comment, while ill-advised, did not rise to the level of a Fifth Amendment violation. The prosecutor's single comment at the outset of his closing argument, when viewed in context with the surrounding statements, did not evince a "manifest intent" to comment on the defendant's right not to testify nor was it of "such a character" that the jury would have believed it be a comment on the defendant's decision not to testify; rather, the prosecutor seemed to be issuing a blanket "mea culpa" for any future mistakes he might commit during his closing argument.

In any event, even if the isolated statement was, in fact, error, we conclude that this non-structural constitutional error was harmless beyond a reasonable doubt. To determine whether an error of this nature was harmless, we consider "(1) whether the remarks were isolated or extensive; (2) whether the remarks 'came at a critically important juncture in the trial'; (3) the prosecutor's verbal and physical delivery of the remarks; (4) what curative instructions were given and when; and (5) whether the evidence of the defendant's guilt was otherwise overwhelming." *State v. Colvett*, 481 S.W.3d 172, 208 (Tenn. Crim. App. 2014) (quoting *Jackson*, 444 S.W.3d at 592).

Applying these factors to the instant case, we conclude that the prosecutor's remarks were isolated and occurred at the outset of the prosecutor's closing argument, which provided the defense with an "opportunity to respond." *Jackson*, 444 S.W.3d at 592. Nothing in the record indicates that the prosecutor's delivery of the comment was remarkable. With respect to curative measures, the trial court overruled the defendant's objection but gave a comprehensive instruction to the jury emphasizing the defendant's absolute right not to testify or put on proof and the importance of not inferring any guilt on that basis. Finally, when weighing the prosecutor's statement against the strength of the case, we conclude that the evidence against the defendant, while circumstantial, was extremely strong. Taking all of these factors together, any error occasioned by the prosecutor's commentary was harmless beyond a reasonable doubt.

*IV. Sufficiency*

Finally, the defendant claims that the evidence was insufficient to support his convictions of vehicular homicide and reckless endangerment.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As alleged in this case, vehicular homicide is the "reckless killing of another by the operation of an automobile as the proximate result of the driver's intoxication." T.C.A. § 39-13-213(a)(2). Reckless endangerment occurs when a person "recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a).

A criminal conviction may be based solely on circumstantial evidence. *Dorantes*, 331 S.W.3d at 379. The appellate court will not reweigh the circumstantial evidence used by the trier of fact in convicting the defendant, assuming that such evidence bespeaks the guilt of the defendant in a measure that satisfies the requirement of due process outlined in *Jackson*. *Jackson*, 443 U.S. at 319. In other words, the appellate court must examine the evidence to ensure that any "rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *Id*. That due process determination cannot be left to the unfettered whim of the trier of fact. We have undertaken an examination to ensure the evidence is sufficient to satisfy the constitutional standard. *See also* Tenn. R. App. P. 13(e).

With respect to the vehicular homicide conviction, the defendant does not dispute that he was intoxicated while operating a motor vehicle on the evening of June 23, but he contends that the State failed to prove that his operation of the vehicle while intoxicated was the proximate cause of the victim's death.

The proof adduced at trial established that the defendant, who was observed by multiple witnesses unsteadily exiting and reentering his white GMC Yukon before twice striking a building with his vehicle, appeared to be intoxicated as he sped away from the Raphael's restaurant parking lot in the direction of the Fort Henry Drive bridge

- 19 -

just before 7:55 p.m. on June 23. A traffic camera captured the defendant's vehicle passing through the intersection of Fort Henry Drive and Moreland Drive at 7:55:49 p.m. At the same time, the victim was observed to be standing on the Fort Henry Drive bridge near the guardrail and talking on his cellular telephone. Mrs. Cooper, who was driving over the bridge in the opposite lane, saw "a flash of white" as a vehicle "drifted over the line," and the victim's body was "propelled over the rail like a swan dive." The victim's friend, Mr. Denton, heard a loud noise and turned in time to see the victim in midair in a "jackknife position" going over the bridge while a "white blur" traveled across the bridge.

The defendant continued driving north on Fort Henry Drive and was soon observed by Mr. Womack to be driving dangerously and erratically. Mr. Wolfe also came upon the defendant's vehicle and observed his erratic driving; Mr. Wolfe followed the defendant when he took the Memorial Drive exit, where the defendant stopped on the exit ramp. When Mr. Wolfe approached the defendant's vehicle, he observed that the passenger side mirror was folded in and that the defendant was unconscious. Both Mr. Wolfe and Mr. Arnold, who had also stopped to assist, had difficulty rousing the defendant. When police officers arrived at the scene, the defendant stated that he was "guilty" and had "been drinking." The defendant's blood alcohol content was later determined to be 0.373, more than four times the legal limit.

Police officers discovered that the passenger side of the defendant's tire, wheel rim, and running board had been "wiped clean" as though that portion of the vehicle had come "into contact with something." The victim, who died as a result of blunt force trauma to the head and neck, sustained an injury to his left leg that the pathologist opined was consistent with his having been in a standing position at the time he was struck by a vehicle.

We hold that the evidence was legally sufficient to support the conviction of vehicular homicide.

Turning to the defendant's convictions of reckless endangerment, the proof established that the defendant twice struck the Raphael's restaurant building with his 5,746 pound vehicle, causing the patrons who were seated mere feet away to scream and the glass separating the vehicle from the patrons to rattle. The defendant then recklessly drove through the restaurant parking lot, nearly striking Ms. Drecol in the process.

Viewing this evidence in the light most favorable to the prosecution, we conclude that the evidence adduced at trial sufficiently established the defendant's convictions of vehicular homicide and reckless endangerment. Although not raised by

the defendant on appeal, we hold the evidence likewise supports his additional convictions.

## *Conclusion*

Based upon the foregoing analysis, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE